UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-22445-CIV-LENARD/SELTZER

UNITED STATES OF AMERICA and
STATE OF FLORIDA, ex rel. ARTHUR
E. DESROSIERS, III, MD,

      Relator/Plaintiffs,

vs.

SETH R. THALLER, M.D. and
UNIVERSITY OF MIAMI,

      Defendants.

_____/

## ORDER ON EXPERT WITNESS MOTIONS

**THIS CAUSE** has been referred to the undersigned[1] for disposition of three motions pertaining to expert witnesses: Defendants' Motion to Strike Dr. James Flores as an Expert Witness and to Strike His Expert Report [DE 200]; Defendants' Motion to Strike Jean Acevedo as an Expert Witness and to Strike Her Expert Report [DE 201]; and Relator's Corrected Motion to Disqualify Larry H. Hollier, Jr., M.D. from Testifying at Trial on Behalf of Defendants, Seth R. Thaller, M.D. and/or University of Miami [DE 222]. The motions have been fully briefed and the Court heard oral argument[2] on September 28, 2016. The Court also conducted an _ex parte_ hearing on September 30, 2016, for the purpose of

---

[1] The motions were previously referred to Magistrate Judge Alicia M. Otazo-Reyes for disposition [DE 204][DE 224]. After an Order of Recusal [DE 227] was entered, the motions were referred to the undersigned by way of a random reassignment [DE 236].

[2] The parties stipulated to the use of depositions at the hearing on the pending motions [DE 249].

taking testimony [DE 267] from Assistant United States Attorney Franklin Monsour on issues pertaining to the Relator's Motion to Disqualify [DE 222].

I.  BACKGROUND

This is a qui tam action brought by Arthur E. Desrosiers, III, M.D. ("Plaintiff" or "Relator" or "Desrosiers") on behalf of the United States and the State of Florida, alleging that Defendants violated the federal False Claims Act, 31 U.S.C. § 3729, and its state law equivalent, Fla. Stat. § 68.082.  Defendants are Seth R. Thaller, M.D., and the University of Miami (collectively "Defendants" and individually "Dr. Thaller" and "UM").  Plaintiff alleges that Defendants committed fraud against the United States and the State of Florida by submitting false claims to Medicare and other federally and state-funded health care programs for unnecessary, upcoded, or improperly coded medical procedures performed on hundreds of patients, resulting in payments for services that were not performed or were not medically necessary [DE 31].

Both the United States and the State of Florida declined to intervene in the action [DE 32] [DE 38]; Plaintiff continues to pursue the fraud claims in the name of both the United States and the State of Florida pursuant to 31 U.S.C. § 3730(b)(1) and Fla. Stat. § 68.084(3).  Plaintiff's Second Amended Complaint [DE 31] seeks civil penalties, treble damages, costs, and a percentage of any amounts recovered on behalf of the United States and the State of Florida.  Defendants have filed an Answer and Affirmative Defenses to the Second Amended Complaint [DE 94], and this matter has been set for trial on February 6, 2017 [DE 168].

II.    PLAINTIFF'S EXPERT WITNESSES

Plaintiff has disclosed two expert witnesses to testify on his behalf: Jean Acevedo and Jaime Flores, M.D. [DE 201-2].  Acevedo is expected to testify as an expert in medical coding and would offer "her opinion that Dr. Thaller showed a pattern of knowing[ly] overcoding in the submission of claims to the federal healthcare programs" [DE 201-2]. Dr. Flores is expected to testify as a medical expert and would offer his opinions as to the quality of  training provided by Dr. Thaller to resident physicians at the University of Miami, the coding of claims by Dr. Thaller, as well as to the nature and quality of surgeries performed and billed by Dr. Thaller.

Defendants have moved to strike Acevedo's and Dr.  Flores' testimony and reports for failing to meet the criteria of Rule 702 of the Federal Rules of Evidence and/or the standard for admissibility of expert testimony set forth in Daubert v. Merrell Dow Pharmeceuticals, Inc., 509 U.S. 579 (1993).

A.    THE LAW

The testimony of expert witnesses is governed by Rule 702, Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and

3

> (d)    the expert has reliably applied the principles and
>         methods to the facts of the case.

Fed. R. Evid. 702.  The Supreme Court has stated that "the inquiry envisioned by Rule 702 is a flexible one" in which "[m]any factors will bear on the inquiry, and [there is no] definitive checklist or test."  Daubert, 509 U.S.at 593-94.  District courts are to perform the critical "gatekeeping" function of deciding the admissibility of scientific and technical evidence by conducting an "exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis in original) (citations and internal quotations omitted).

The Eleventh Circuit has set forth a "rigorous three-part inquiry" for determining the admissibility of expert testimony under Rule 702:

> (1) the expert is qualified to testify competently regarding the
> matters he intends to address; (2) the methodology by which
> the expert reaches his conclusions is sufficiently reliable as
> determined by the sort of inquiry mandated in Daubert; and (3)
> the testimony assists the trier of fact, through the application
> of scientific, technical, or specialized expertise, to understand
> the evidence or to determine a fact in issue.

Id. (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).  This three-part test addresses the expert's qualifications, reliability, and helpfulness; the burden of establishing each rests upon the proponent of the expert testimony. Frazier, 387 F.3d at 1260.  "The party seeking to admit the expert testimony bears the burden of laying the proper foundation for its admissibility by a preponderance of the evidence." Armfield v. Gills, 2013 WL 371457 at *2 (M.D. Fla. Jan. 30, 2013) (citing Allison v. McGhan Medical Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

The first factor, qualification, is established as set forth in Rule 702: "by knowledge, skill, experience, training, or education." Frazier, 387 F.3d at 1260-61. One factor is not superior to the others; experience alone may qualify a witness as an expert. Id. However, even if an individual qualifies as an expert, that expert's testimony and opinions must nonetheless be reliable. Id. at 1261.

Thus, the second factor that the courts must consider is reliability. Courts must consider the particular circumstances of each case in determining whether proffered expert testimony is reliable. Armfield, 2013 WL 371457 at *2 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150-151 (1999). "Thus, it remains a basic foundation for admissibility that '[p]roposed [expert] testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Id. (quoting Daubert, 509 U.S. at 590).

In Daubert, the Court set out several guideposts that a district court may consider in assessing the reliability of expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the scientific community. Daubert, 509 U.S. at 593-94. The same criteria "may be used to evaluate the reliability of non-scientific, experienced-based testimony." Frazier, 387 F.3d at 1262 (citing Kumho Tire Co., 526 U.S. at 152. Courts have recognized that trial judges "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Id.

The third factor, helpfulness, is satisfied where the subject matter of the proposed testimony "concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262.  But "where an expert opinion has a tendency to confuse the trier of fact, it may not satisfy the helpfulness prong."  J.G. v. Carnival Corp., 2013 WL 752697, at *4 (S.D. Fla. Feb. 27, 2013) (citing Frazier, 387 F.3d at 1263).  Importantly, however, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (citations omitted).  An expert's testimony is subject to "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," and the court must be careful not to "supplant the adversary system or the role of the jury."  Id.

B.    ANALYSIS

**1.    Jean Acevedo**

Plaintiff has designated Jean Acevedo as a medical coding expert.  She is a Certified Professional Coder, national lecturer, and adjunct faculty member at Florida Atlantic University [DE 209-1].  Acevedo has been qualified as an expert witness on coding in numerous state and federal court actions and has served as a lecturer, workshop leader, and author on coding issues for the American Academy of Professional Coders ("AAPC") [DE 209-1][DE 209-4].  Defendants do not contest Acevedo's qualifications as a coder, although they do argue that certain of her opinions are outside the area of her expertise.

According to her expert report, Acevedo reviewed 121 patient cases and found the following:

> 57 of the 121 cases lacked sufficient documentation to support the procedures coded, were unbundled, or otherwise evidenced overcoding. Based on the documentation provided, there were also instances of claims submitted to Medicare and Medicaid for noncovered cosmetic services as if they were medically necessary covered procedures. These 57 wrongly coded cases out of a total of 121 cases equate to a 47% over coded error rate, quite striking for surgical procedures.

[DE 201-1]. Acevedo concluded that "Dr. Thaller showed a pattern of knowing over coding in the submission of claims to federal health programs" [DE 201-1].

During her deposition, Acevedo acknowledged that her coding error rate was based on the number of patient encounters, rather than the total number of codes entered by Dr. Thaller [DE 201-3]. Thereafter, Acevedo prepared an affidavit [DE 209-4] in which she explained that the 57 wrongly coded services out of 224 codes entered resulted in a 24.45% error rate, not a 47% error rate.[3] Nonetheless, Acevedo's affidavit states that 57 services were billed that were not supported by documentation for the code(s) assigned and that a 24.45% error rate in codes was not reasonable [DE 209-4].

Defendants move to strike Jean Acevedo as an expert witness and to strike her expert report [DE 201]. Defendants contend that Acevedo's opinion about the medical necessity of surgical procedures performed by Thaller is (a) outside the scope of the pleadings, (b) outside Acevedo's area of expertise, and (c) devoid of factual or analytical support. Defendants also argue that the errors in the methodology Acevedo used to calculate the alleged coding error rate render her opinions (d) unreliable and, therefore, inadmissible.

---

[3] The Court notes that 57 wrongly coded services out of 224 codes entered results in a 25.45% error rate.

a.      Scope of pleadings. Acevedo's expert report states that Dr. Thaller "submitted [claims] to Medicare and Medicaid for noncovered cosmetic services as if they were medically necessary covered procedures" [DE 201-1]. Defendants move to strike this opinion, arguing that none of the pleadings in this case contain allegations regarding the medical necessity (or lack thereof) of medical procedures performed by Dr. Thaller. In response, Plaintiff points specifically to paragraphs 7, 12, and 110 of the Second Amended Complaint [DE 31], wherein Plaintiff alleges that Defendants submitted claims for services that (1) were not performed or (2) they had reason to know were not medically necessary. The Court finds that Plaintiff has sufficiently pled that Defendants billed for non-covered cosmetic services as if they were medically necessary covered procedures and concludes that Acevedo's opinion regarding the same is relevant to the issues in the case.

b.      Area of expertise.   Defendants also argue that Acevedo is not properly qualified to testify about the medical necessity of the claims submitted because she is not a trained medical professional, such as a physician or a nurse. As set out in Rule 702, expert status may be based upon "knowledge, skill, experience, training, or education." A specialized degree is one way of qualifying as an expert witness, but it is not the only way. Experience in the field of testimony may also lead to expert status. Frazier, 387 F.3d at 1260-61. Defendants nevertheless argue that because Acevedo is not a medical professional who is licensed to make a medical diagnosis, she is not qualified to render opinions about the medical necessity of procedures performed by Dr. Thaller.

Plaintiff responds that Defendants misconstrue Acevedo's opinion and testimony. Acevedo testified that her opinion regarding medical necessity was rendered from a coding

standpoint, from the payer's perspective, rather than from a medical perspective [DE 209-2, p. 125]. In her affidavit, Acevedo explained:

> Determining whether a surgical procedure is clinically appropriate for a particular patient is best left to the medical physician. Understanding payers' like Medicare and Medicaid policies and applying their coverage criteria to a service is well within the expertise of a certified coder. Both are reflective of whether a procedure is considered "medically necessary." In the cases that I considered not medically necessary, I am not opining as to the former, whether a procedure was clinically appropriate. Rather, I am applying the payer's criteria as to whether or not the service is a covered procedure. Both Medicaid and Medicare do not consider cosmetic procedures as medically necessary, covered services [DE 209-4].

Thus, the conclusion rendered by Acevedo that certain procedures were "not medically necessary" related to the type of codes applied to the procedures performed, not to the clinical diagnosis made by Dr. Thaller. A Florida state court considered, and rejected, a similar argument offered in support of excluding a coding expert:

> While Ms. Pacha does not have the necessary medical background to render an opinion on whether the medical care allegedly provided to Mr. Bowling was reasonable, she does have the requisite skill and training to render an opinion on whether the bills submitted by his medical providers accurately reflect the care documented in the medical records of those same providers.

State Farm Mut. Auto. Ins. Co. v. Bowling, 81 So.3d 538, 541 (Fla. 2d DCA 2012). Likewise, because Acevedo's opinions relate to the quality of the codes and to whether the procedures coded were covered according to the payers' criteria, and not to whether the procedures were necessary medically, the Court concludes that Acevedo's opinions are within the scope of her coding expertise.

c.    Factual or analytical support.  Defendants argue that Acevedo's opinion that certain procedures were "not medically necessary," i.e., non-covered procedures, is not based upon adequate factual or analytical support and is, therefore, unreliable. Specifically, Defendants contend that because Acevedo's opinions on covered/non-covered procedures were based upon Dr. Thaller's operative reports and not on the complete medical files, her opinions regarding the medical necessity, or coverage of procedures, are based upon incomplete information and should be stricken.

In response, Plaintiff argues that Acevedo has applied the "payer's criteria to determine whether or not the services described [in Dr. Thaller's operative reports] are covered" [DE 209, p.6].  Acevedo testified in deposition that the surgeon's operative report typically states the medical indications for the surgery, although she acknowledged that Medicare sometimes requests additional information to support a claim [DE 209-2, pp. 122-124].  Acevedo has prepared a spreadsheet and narrative for each patient chart that she opines contained improper coding or upcoding.  Her report includes "what she reviewed, her findings and the resources used to make her determinations" [DE 209, p.7]. Plaintiff argues that Defendants will have ample opportunity to subject Acevedo's conclusions to cross examination and/or  competing testimony.

To evaluate the reliability of expert opinion, courts must

> "consider, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique and (4) whether the technique is generally accepted in the scientific community.  These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion.

10

United States v. Diaz, 2008 WL 906725, at *4 (S.D. Fla. Mar. 28, 2008) (citing Frazier, 387 F.3d at 1261-62)(emphasis added). Indeed, in considering a challenge to a coding expert's testimony, the Diaz court noted that "the factors that would normally be used to gauge scientific expert opinion, such as peer review, publication and rates of error, are not appropriate" means of assessment.  Id. at 5.  When it is "determining the evidentiary reliability [of an expert's opinion], the trial judge is limited to considering the methodologies relied upon by the expert, not the conclusions reached by the expert." State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Center, Inc., 2009 WL 6357793, at *20 (M.D. Fla. Jan. 9, 2009). "Thus, a trial court may exclude expert testimony that is imprecise and unspecific, or whose factual basis is not adequately explained." Cook ex rel. Tessier v. Sheriff of Monroe County, 402 F.3d 1092, 1111 (11th Cir. 2005)(internal quotation and citations omitted).

In this matter, Acevedo's opinions are based upon sufficient facts and analytical support to meet the threshold of reliability.  Her analysis of the medical codes submitted for reimbursement is documented, as is the information that she used to make her analysis.  Her conclusions are capable of being tested, replicated or challenged on cross examination.  Accordingly, the Court finds that Acevedo's opinions are based upon adequate factual and analytical support and, therefore, concludes that those opinions are reliable.

### d.   Errors in methodology

Defendants' final challenge to Acevedo's expert testimony is her admitted mistake in calculating the coding error rate.  Acevedo's report contained the opinion that Dr. Thaller's billing revealed a coding error rate of 47% for surgical services [DE 201-1]. During

11

her deposition and in her subsequent affidavit, Acevedo acknowledged that she "inadvertently computed the error rate based on the total number of cases versus the total number of CPT codes reported" [DE 209-4].  Acevedo revised her calculations using the total number of CPT codes reported and concluded that "57 wrongly coded services out of 224 codes resulted in a 24.45% error rate," which she opined was nevertheless unreasonable for an experienced surgeon such as Dr. Thaller [DE 209-4].

Defendants argue that the error in Acevedo's calculations renders her opinions inadmissible under <u>Daubert</u> as they are "entirely unreliable."  The Court disagrees. Acevedo's calculations were made on a case-by-case basis, using Dr. Thaller's surgical reports and coding records, and based upon "industry standard medical record review criteria" [DE 209-4].  The error referred to by Defendants was a mathematical one that has been corrected; the supplemental information and corrected opinion have been provided to Defendants as required by Fed. R. Civ. P. 26(e)(2).[4]  Defendants may disagree with the conclusions and opinions rendered by Acevdeo, but Acevedo's deposition testimony and affidavit establish the required elements of qualification, reliability and helpfulness.[5]

_____

[4] Rule 26(e)(2) provides as follows:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

[5] Defendants do not challenge the helpfulness of Acevedo's testimony.  Indeed, Defendants have retained their own coding expert, Marilyn Chew.  In any event, expert testimony regarding medical coding meets the requisite helpfulness standard.  <u>See</u> <u>State Farm Mut. Ins. Co.</u>, 2009 WL 6357793, at *21 ("expert testimony is appropriate for CPT coding").

In sum, having concluded that Acevedo's expert testimony is reliable, the Court will deny Defendants' Motion to Strike Jean Acevedo as an Expert Witness and to Strike Her Expert Report [DE 201].

### 2. Jaime Flores, M.D.

Defendants have also filed a Motion to Strike Jaime Flores as an Expert Witness and to Strike His Expert Report [DE 200]. Jaime Flores is a medical doctor who was, for a brief period of time, employed by the University of Miami as the Chief of Plastic Surgery for the University of Miami Hospital [DE 200, n.1]. Plaintiff has retained Dr. Flores as an expert witness who is expected to offer opinion testimony as to the quality of the coding and the medical procedures performed by Dr. Thaller, as well as to his training of resident physicians at the University of Miami School of Medicine. Defendants' counsel, however, represented (at oral argument) that he is not moving to strike Dr. Flores from testifying as a fact witness; Defendants' motion and arguments are directed to Dr. Flores' expert opinions and their exclusion is sought because they are allegedly not supported by adequate facts or data, and/or are arguably outside the scope of his expertise.

In his report, Dr. Flores states that a "review of patient charts reveals that Dr. Thaller regularly engaged in the practice of upcoding or improper coding . . . on a consistent basis when he knowingly entered CPT codes . . . for more expensive medical procedures than were actually performed" [DE 200-2]. Dr. Flores also opines that he has "observed medical records and coding audit reports in which Dr. Thaller ordered and performed staged surgical procedures which failed to completely repair patient medical issues . . . and subjected patients to unnecessary surgical procedures requiring general anesthesia which created patient harm and patient safety issues" [DE 200-2]. Finally, Dr.

13

Flores opines that "Dr. Thaller failed to properly educate, supervise, and train resident physicians while serving as chief of the Division of Plastic Surgery at the University of Miami School of Medicine" [DE 200-2].

Defendants contend that Dr. Flores' opinion that Dr. Thaller regularly engaged in the practice of upcoding or improper coding consists of (1) conclusory, subjective beliefs (2) that that are devoid of factual or analytical support and (3) are not the product of reliable principles and methods.  Defendants also argue that Dr. Flores' opinion that Dr. Thaller performed staged procedures to the detriment of the patients is devoid of factual or analytical support.  Finally, Defendants contend that Dr. Flores' opinions regarding Dr. Thaller's training of medical students and residents lie well outside Flores' area of expertise, and those opinions are devoid of factual or analytical support.  Defendants, therefore, move to strike Dr. Flores' expert testimony and report in their entirety.

The history of Dr. Flores' expert disclosures and depositions is relevant to these issues.  Dr. Flores' Expert Witness Report [DE 200-2] is dated April 25, 2016.  For the "Facts and/or Data Considered in Forming Opinion," Dr. Flores lists the following items:

1) Second Amended Complaint;

2) Answers to Interrogatories of the parties;

3) Information contained in all Initial and Supplemental Disclosures filed by Plaintiff and Defendants:

4) Two (2) Affidavits submitted by coding expert Jean Acevedo;

5) Spreadsheets showing overcoded services performed by Dr. Thaller;

6) Surgical Audit Reports prepared by Acevedo Consulting;

7)      Error rate dat[a] contained in reports of Plaintiff's coding expert;

8)      Depositions of Dr. Seth Thaller, Dr. Arthur Desrosiers, Dr. Alberto Gallerani, and Dr. Alan Livingston;

9)      Publications listed in my CV;

10)     Publications listed in CV of Dr. Seth Thaller; and

11)     Authoritative resources including CPT code descriptions and guidelines and national correct coding initiative guidelines.

[DE 200-2]. Dr. Flores' "Statements of Medical Opinions" consists entirely of the following:

It is my opinion that Dr. Seth Thaller failed to provide proper guidance as a medical educator. Dr. Thaller failed to properly educate, supervise, and train resident physicians while serving as chief of the Division of Plastic Surgery at the University of Miami School of Medicine. A review of patient charts reveals that Dr. Thaller regularly engaged in the practice of upcoding or improper coding during which he improperly stated CPT codes for billing additional and more expensive procedures when the procedures were not performed. I plan to testify that I have observed medical records and coding audit reports in which Dr. Thaller ordered and performed staged surgical procedures which failed to completely repair patient medical issues. It is my opinion that Dr. Thaller disregarded patient safety and subjected patients to unnecessary surgical procedures requiring general anesthesia which created patient harm and patient safety issues. It is my further opinion that Dr. Thaller improperly coded or upcoded on a consistent basis when he knowingly entered CPT codes which were used for billing Medicare and other government funded programs for more expensive medical procedures than were actually performed and in some instances when no surgical procedures were performed on a given date. The improper medical practices of Dr. Thaller took place while he was an employee of the University of Miami and improper bills were submitted by the University of Miami to federal healthcare programs.

[DE 200-2]. Finally, the "Exhibits Used to Summarize and Support Opinions" were listed

as follows:

> The exhibits to be used to support my opinions include: Dr. Thaller patient medical records; billing records used to submit bills to federal healthcare program, pre and post-surgical photographs of patients; medical articles and publications that support my opinions; medical illustrations of surgical procedures including cleft palate surgeries; Acevedo Consulting spreadsheets showing overcoded services; Acevedo Consulting examples of surgical audit reports and findings of the reports; Acevedo case review error report findings; portions of deposition testimony; as well any answers to interrogatories filed by the parties in the case.

[DE 200-2]. The only attachment to the Expert Witness Report is Dr. Flores' Curriculum Vitae.

Dr. Flores was deposed twice. His first deposition was taken by Plaintiff's counsel on February 6, 2016, before his Expert Witness Report was prepared.  Then, on June 25, 2016, Defendants' counsel took a discovery deposition of Dr. Flores.  Plaintiff argues that Dr. Flores was ill during his June 2016 deposition and that may have affected his testimony.  The Court could not find any reflection of Dr. Flores' illness in the deposition transcript and, therefore, does not consider that factor in this analysis.  Plaintiff also argues that Defendants' counsel repeatedly "talked over" Dr. Flores in the depositions.  Although the record does reflect instances of "talking over," the Court finds that these instances did not impact the quality or substance of Dr. Flores' testimony.

Three days before the June deposition, Defendants served an Amended Notice of Taking Deposition requesting that Dr. Flores bring "[a]ny and all documents including, but not limited to, reports, records, notes or memoranda, outlines or similar writings that you will rely on to explain the opinions set forth in your expert report and/or that you will need to testify to at trial" [DE 200, n.5].  At this deposition, which took place on a Saturday, Dr. Flores was unable to provide copies of the records he reviewed in rendering his opinions;

all of the items upon which he relied to render his opinions were "locked in a file room" by Dr. Flores' office manager, who was not available on the weekend to retrieve them [DE 207-2].

At oral argument, the Court asked counsel if  Dr. Flores' deposition had been rescheduled to allow access to the records that Dr. Flores reviewed. Counsel for Defendants noted that they had paid $3,000.00 for the deposition, that Dr. Flores had testified that there was no reason he could not testify truthfully, and that Dr. Flores submitted no errata sheet, therefore a second deposition was not warranted.  Counsel for Plaintiff was under an apparent misconception that Dr. Flores' deposition took place on one of the last days of the discovery period and could not be rescheduled.[6]   Additionally, according to Defendants' counsel, the unavailable documents were not subsequently provided, although they had reportedly been promised to be produced within the days immediately following the deposition [DE 200, n.5].

The Court presents this history, as reported by the parties, to note the possibility that at least some of the deficiencies in Dr. Flores' testimony may have been cured if he had appeared again for deposition, with copies of the documents he had reviewed. However, as the discovery deadline has now closed, the Court considers Defendants' challenge to Dr. Flores' expert testimony on the record that currently exists.

---

[6] The expert discovery deadline, set by the Court in December 2015, was August 22, 2016  [DE 168].  At the hearing on the present motion, Plaintiff's counsel stated that Dr. Flores' deposition was not rescheduled because the discovery deadline was within days of the deposition.

17

a.      Upcoding or Improper Coding

As discussed above, Dr. Flores expressed his opinion that "Dr. Thaller improperly coded or upcoded on a consistent basis when he knowingly entered CPT codes . . . for more expensive medical procedures than were actually performed and in some instances when no surgical procedures were performed on a given date" [DE 200-2].  In evaluating the admissibility of Dr. Flores' opinions on coding, the Court must consider Dr. Flores' qualifications to render an opinion, the reliability of that opinion, and the opinion's helpfulness to the jury.  Frazier, 387 F.3d at 1260.  Defendants do not challenge Dr. Flores' qualifications or the helpfulness of his opinion testimony on CPT coding.  The only issue before the Court is whether Dr. Flores' opinions of the CPT coding done by Dr. Thaller are reliable and supported by adequate factual or analytical support.

Rule 26(a)(2)(B) requires witnesses who are retained or specially employed to provide expert testimony in the case to prepare and sign a report that contains, in part:

(i)      a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)     the facts or data considered by the witness in forming them;

(iii)    any exhibits that will be used to summarize or support them

Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii)(emphasis added).  One purpose of the disclosure is to provide the opposing party sufficient information to reasonably prepare for cross examination. Brown v. NCL (Bahamas) Ltd., 2016 WL 3251896, at *3 (S.D. Fla. June 6, 2016)(Lenard, J.). When a party violates Rule 26(a)(2)(B) by failing to provide a complete statement of all of the expert witness' opinions "and the basis and reasons for them,"

exclusion of the expert's testimony is warranted under Rule 37(c). Id. at *4 (citing Romero v. Drummond Co., 552 F.3d 1303, 1323 (11th Cir. 2008)).

In addition, Rule 702, Federal Rules of Evidence, requires that an expert's proposed testimony meet certain criteria, including reliability and a sufficient basis of facts and data. Fed. R. Evid. 702(b) and (c).  Expert opinions that are unsubstantiated by any factual basis or "whose factual basis is not adequately explained" are properly excluded. Cook, 402 F.3d at 1111.

Dr. Flores' expert disclosure report does not provide any specific factual information in support of his opinions.  The report does not contain any information about how many patient charts were reviewed, which cases were reviewed, the hospital(s) at which the surgeries were performed, the types of medical procedures that were performed or the types of CPT codes that were allegedly upcoded or improperly coded. Furthermore,  Dr. Flores' report provides no specificity as to the methodology  used to determine the CPT codes.  Although the report does disclose that Dr. Flores reviewed the records and reports prepared by Acevedo Consulting,[7] it  does not identify the facts (if any) on which he relied in rendering his opinion; it offers only the broad statement that certain CPT codes did not match the procedures detailed on the operative report. The Court, therefore, agrees with Defendants that Dr. Flores' expert report setting forth his opinion on upcoding or improper coding is conclusory and without factual support. Accordingly, the report  fails to comply

---

[7] The Court notes that it is permissible for an expert to base his opinions on data that he did not personally prepare.  Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94 (2d Cir. 2000)(opinions based on data compiled by other experts admissible); Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").  The issue, however, is whether such expert opinion is based on sufficient facts or data.  Fed. R. Evid. 702(b).

with the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(B) and the requirements of Rule 702.

Dr. Flores was also twice deposed; however, his deposition testimony does not add much, if any, factual support or reliability for his opinion that Dr. Thaller "improperly coded or upcoded on a consistent basis."  Plaintiff states in his responsive memorandum [DE 207] that Dr. Flores provided detailed testimony regarding his opinions in his depositions. The sole factual basis for upcoding provided by Plaintiff from Dr. Flores' February 6, 2016 deposition is contained in pages 39-41 of that deposition transcript  [DE 207-3, p. 7]:

> Q.    I want to ask you about your knowledge of coding practices, billing practices of Dr. Thaller.  Do you have knowledge of whether or not Dr. Thaller was criticized by residents for charging for a surgical procedure that he did not do? . . . .
>
> A.    Yes, so it's – so when you're a resident – so I would – so all the faculty would log in their codes into the computer; usually, at the end of the case you know what you did.  I would go over to the resident, "Look, this is what we did.  This is the code.  It means this." . . . . . .
>
> Q.    This was part of your education of a resident.
>
> A.    Yea, part of my education to the resident. So on more than one occasion the resident would say "Well, what would you code for a lipoma removal?", which is a benign tumor.  So, sure, I know the code by hand.  It's 11406, benign tumor.  And he goes, "Well, you know, Dr. Thaller coded radical resection of a tumor."  So that's a – it's two separate, two totally different codes. For any malignant tumor, you know, you don't go into surgery not knowing what the tumor is.   You have to have a biopsy.  For lipoma, it's a clinical decision.  The payment for a lipoma is two hundred bucks.  For a radical resection, it's between eight hundred and two thousand.  They are two totally separate codes, two – one hundred percent separate.

In his June 25, 2016 deposition, Dr. Flores recounted that he reviewed nine medical files, approximately 50 entries from Jean Acevedo's expert report, and a CPT coding manual [DE 207-4, pp. 5-7].[8]   Dr. Flores opines from this that "there were numerous operative procedures that did not match the CPT code billed for those cases specifically, it appeared that some of the cases that I reviewed they were overbilled, had a CPT code that did not match the operative procedure, at least it did not match the descriptor to the CPT code" [DE 207-4, p. 7].   Plaintiff reports that Dr. Flores did give one factual example, concerning rhinoplasty codes:

> So if you had to list a trend, there were cases of true rhinoplasty codes that didn't appear to have a rhinoplasty procedure.  So I will give you an example of you put in a cartilage inside a nose; it's an alar batten graft.  You put a piece of cartilage on the lateral part of the nose, which I do all the time, and it has a specific code for that and it's not a full rhinoplasty code.  So there were a lot of those trends. If I can recall, yes. . . . . So I reviewed some of those operative reports, some of the patient photos, the nine patient photos.  Some of the cases were in there so I can't give you a specific name, and then some of the 50 of the CPT codes that were reviewed by Ms. Acevedo had the same issue [DE 207-4, p. 7].

However, Dr. Flores did not provide any specific testimony on how many of these instances occurred to support his opinion of a "trend" on rhinoplasty codes, the specific procedures performed, or the accuracy of the actual CPT codes assigned.

> Q.    Did you reach any opinions about whether or not those procedures were properly coded?  Was that what you were reviewing them for?
>
> A.    Yes.

---

[8] Significantly, none of these items were presented at the deposition.

Q.      And as we sit here today, can you tell us what those opinions were?

A.      If I see the actual picture and the coding, I can actually tell you what the opinions were.

Q.      Without that information you are unable to answer questions about that currently. Is that right?

A.      Correct.

Q.      Okay.  And I'm sorry.  I apologize, but I want to make sure I'm clear on the record. If I gave you time here in your office, you still couldn't get those records to answer those questions?

A.      Correct.  I would have no idea.

Q.      Is there anything you can tell me about the opinions for those nine or so patients, as we sit here today, in terms of the scope of what your opinions were about?

A.      No, and I would have to see them.  I mean, I went through them specifically with the pictures and all.

[DE 200-3, 4].  Accordingly, the Court agrees with Defendants that Plaintiff has failed to connect Dr. Flores' testimony on upcoding with a sufficient factual basis or foundation and, therefore, Dr. Flores' opinions on upcoding should be stricken. Brown, 2016 WL 3251896, at *4 (excluding expert opinions where party failed to provide complete statement of opinions and the basis and reasons for them); Fed. R. Evid. 702(b).

    b.    Staged Procedures

    Dr. Flores' second opinion addresses the nature of surgeries performed by Dr. Thaller.  Dr. Flores opined in his Expert Witness Report that "I have observed medical records and coding audit reports in which Dr. Thaller ordered and performed staged surgical procedures which failed to completely repair patient medical issues.  It is my

22

opinion that Dr. Thaller disregarded patient safety and subjected patients to unnecessary surgical procedures requiring general anesthesia which created patient harm and patient safety issues" [DE 200-4]. The essence of these opinions is that Dr. Thaller ordered and performed multiple surgeries to repair cleft lips and cleft palates, when those repairs are typically made in one or two surgeries.

In his deposition, Dr. Flores testified that he has never personally seen or done a cleft lip or palate repair that required more than two surgeries, although he has known that some other physicians made repairs using four or five surgeries [DE 207-3, pp. 8-10].  He opined that "I have never seen a single person who does the same procedure more than five times on a single patient ever in my career, nor do I know anyone in the craniofacial world that has done that" [DE 207-4, p. 13].

Dr. Flores testified that he based his opinion of the quality of the surgeries performed by Dr. Thaller on a review of nine patient medical records (out of the 158 patient cases at issue in this action), including pictures and the operative reports, but not the patient progress notes or physical examination.  Dr. Flores stated that in reviewing the nine cases,  his "purpose was to review the operative procedure, what was dictated, what was actually performed by what was stated, whoever was the dictating physician, and what was actually coded, matching that procedure" [DE 200-3, p.6].  Yet, Dr. Flores also stated that he would need a complete medical history of a particular patient to determine if a procedure was medically necessary; he did not have that information for the nine patient charts he reviewed [DE 200-3, p. 6].  Dr. Flores did not cite, either in his Expert Witness Report or in his deposition, any learned treatises or articles that would support his opinions.  For all of these reasons, Defendants argue that Dr. Flores' opinions regarding the medical

necessity and harmful nature of the surgeries performed by Dr. Thaller are not based on adequate facts or data and should be stricken.

Plaintiff counters that <u>Daubert</u> does not exclude expert opinion based upon experience.  Plaintiff argues that it is permissible for an expert to "draw a conclusion from a set of observations based on extensive and specialized experience."  <u>Kumho Tire Co.</u>, 526 U.S. at 157.  And he argues that  "Dr. Flores' opinions are based upon his extensive and specialized experience and his testimony will be of great assistance to the jury" [DE 207, p. 6].

Although the Court agrees with Plaintiff that Dr. Flores has extensive and specialized experience in the field of craniofacial surgery, the Court finds that there is simply too great an analytical gap between the facts presented and the opinions rendered by Dr. Flores concerning the staged procedures conducted by Dr. Thaller.  The Court is not required "to admit opinion evidence which is connected to existing data only by the <u>ipse dixit</u> of the expert."  <u>Cook</u>, 402 F.3d at 1111 (quoting <u>Michigan Millers Mut. Ins. Corp. v. Benfield</u>, 140 F.3d 915, 921 (11th Cir. 1998) (quoting <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997)).  Because Plaintiff has not shown that Dr. Flores has an adequate factual basis for his opinions regarding the staged procedures, the Court concludes that Dr. Flores' opinions regarding the propriety of the staged procedures will be excluded.

<u>c.</u>     <u>Supervision and Training of Resident Physicians</u>

The third area of Dr. Flores' expert testimony that Defendants seek to strike is his opinion regarding Dr. Thaller's training of resident physicians.  Dr. Flores opined that "Dr. Seth Thaller failed to provide proper guidance as a medical educator. Dr. Thaller failed to properly educate, supervise, and train resident physicians while serving as chief of the

Division of Plastic Surgery at the University of Miami School of Medicine" [DE 200-4]. Defendants argue that Dr. Flores' opinions on this issue are outside the scope of his expertise.  Plaintiff contends that Dr. Flores is qualified to offer opinions about the teaching program at University of Miami based upon his personally observing  the program during the six months that he worked there and by comparing those observations with his experiences at Johns Hopkins, Duke, NYU, the University of Chicago, Dartmouth, UCLA, and UCSF [DE 207].

In his depositions, Dr. Flores described various practices of Dr. Thaller that Flores had either personally observed or had learned from resident physicians in the program, practices that Dr. Flores considers inadequate.  According to Dr. Flores, Dr. Thaller frequently failed to attend or participate in grand rounds, failed to question the residents regarding their cases, and failed to provide constructive criticism [DE 207-4, p. 14].  Dr. Flores observed that Dr. Thaller also failed to hold weekly meetings, or any meetings, with residents to discuss their logs and cases [DE 207-4, p. 14].  Dr. Flores compared Dr. Thaller's conduct with that which he observed at other institutions and he concluded that Dr. Thaller's department is offering inadequate education to the medical residents at the University of Miami.

Although an expert's testimony may be based upon experience, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable <u>any</u> conceivable opinion the expert may express."  <u>Frazier</u>, 387 F.3d at 1261 (emphasis in original).  Even with appropriate experience, the expert testimony must be reliable, or "supported by appropriate

validation–i.e., 'good grounds,' based on what is known." Id. (quoting Daubert, 509 U.S. at 590).

Dr. Flores offers the opinion that Dr. Thaller and the University of Miami, at least in the department chaired by Dr. Thaller, is not adequately educating, training and supervising medical residents.  However, Plaintiff has not shown that Dr. Flores possesses the experience or the necessary information to evaluate the effectiveness and adequacy of a resident physician education program. As Dr. Flores acknowledged, he has never run a department in which teaching physicians reported to him; nor has he ever reviewed the operating agreement between the University of Miami and Jackson Memorial Hospital, which would set forth the duties required of Dr. Thaller [DE 200-3, p. 20].  Further, Dr. Flores is not aware of the core curriculum required by ACGME, the medical school accrediting agency; nor does he know whether the University of Miami and Dr. Thaller fulfilled the curriculum requirements [DE 200-3, p.22].  Although Dr. Flores views the program he observed at Miami less favorably than those at the other institutions where he has worked, Dr. Flores has not offered "good grounds" – or verifiable data or standards – to support his opinion that the resident education offered in Dr. Thaller's department is inadequate.  For this reason, the Court concludes that Dr. Flores' opinion on the teaching standards at University of Miami does not meet the requirements of admissibility under Daubert and, therefore, his opinions on that subject will be excluded.

In sum, having concluded that Dr. Flores' opinion testimony does not meet the requirements of admissibility under Fed. R. Evid. 702 or Dauber, the Court will grant Defendants' Motion to Strike Dr. Jaime Flores as an Expert Witness and to Strike His Expert Report [DE 200].

C.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Strike Dr. Jaime Flores as an Expert Witness and to Strike His Expert Report [DE 200] will be GRANTED.  Nothing in this recommendation affects any fact testimony that may be offered by Dr. Flores. Defendants' Motion to Strike Jean Acevedo as an Expert Witness and to Strike Her Expert Rerport [DE 201] will be DENIED.

III.    DEFENDANTS' EXPERT WITNESS

Defendants have disclosed Larry H. Hollier, Jr., M.D.  ("Dr. Hollier") as an expert witness to testify on several issues: performance of multiple surgical procedures; proper education, supervision, and training of resident physicians; CPT code billing; determination of the medical necessity of surgery; and review of specific patient records, surgical photographs, and operative reports.[9] [DE 222-1].  Dr. Hollier is a board-certified plastic surgeon who specializes in plastic and reconstructive surgery and who currently serves as the Chief of Pediatric Plastic Surgery at Texas Children's Hospital and as Chief of Plastic Surgery at Baylor College of Medicine. [DE 222-1].

Plaintiff moves to disqualify Dr. Hollier from testifying for Defendants on the basis of an alleged conflict of interest:  Dr. Hollier had previously been retained in this matter as a consulting expert by the United States. Plaintiff contends that he stands in the shoes of the United States, the real party in interest, in this qui tam action and, therefore, has

---

[9] Defendants have also disclosed Dr. David A. Staffenberg, M.D., as an expert witness who will offer testimony regarding performance of multiple surgical procedures, determination of the medical necessity of a surgery, review of specific patient records, surgical photographs and operative reports, and proper operation of a medical residency program [DE 222-2].  In addition, Defendants are expected to introduce expert testimony on CPT coding from another expert witness, Marilyn Chew [DE 209, p. 9, n.1].

standing to assert the Government's claim of confidentiality as to Dr. Hollier. Plaintiff also asserts generally that Dr. Hollier's testimony is cumulative to Dr. Staffenberg's testimony and should therefore be disallowed.[10]  Finally, Plaintiff argues that any probative value of Dr. Hollier's testimony is substantially outweighed by the danger of unfair prejudice to Plaintiff were the jury  to discover that Dr. Hollier had previously been retained by the United States.  Fed. R. Evid. 403.

Defendants argue that Dr. Hollier should not be disqualified because (1) Dr. Hollier did not have a confidential relationship with Plaintiff, notwithstanding that Plaintiff initially disclosed Dr. Hollier as a potential expert witness; (2) no confidential information was shared with Dr. Hollier by either the Government or Plaintiff; (3) disqualification at this late date would severely prejudice Defendants; and (4) any objections that Plaintiff or the Government might have had to Defendants' hiring of Dr. Hollier have been waived.

The Court heard oral argument on the Motion to Disqualify on September 28, 2016 [DE 264].  The parties had previously agreed to rely on the affidavits and exhibits in the record[11] as support for their respective positions; however, at the oral argument, it became clear to the Court that testimony from the Government's lawyer would be necessary.  The parties expressed no objection to the Court conducting an ex parte hearing with the Government's lawyer, Assistant United States Attorney Franklin Monsour; an ex parte hearing with Monsour was held on September 30, 2016.  Monsour was sworn and provided

---

[10] The Court considers the argument about cumulative evidence to be a matter for the District Court to determine at trial pursuant to Fed. R. Civ. P. 403. However, the availability of alternative expert testimony is relevant to  the issue of disqualification.

[11] The parties also submitted evidence at the oral argument [DE 268 ][DE 269 ] which remain in the  possession of the Court.

testimony about the Government's retention of Dr. Hollier and its subsequent lack of objection to Hollier's hiring by Defendants [DE 267].

A.    THE LAW

Federal courts possess the inherent power to disqualify an expert witness.  Koch Refining Co. v. Boudreaux, 85 F.3d 1178 (5th Cir. 1996).  "That power derives from the necessity to protect privileges which may be breached when an expert switches sides, and from the necessity to preserve public confidence in the fairness and integrity of judicial proceedings."  Larson v. Rourick, 284 F. Supp. 2d 1155, 1156 (N.D. Iowa 2003).  The courts have a duty "to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process."  Wang Laboratories, Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248 (E.D. Va. 1991).  However, "[d]isqualification [of an expert witness] is a drastic remedy that courts use sparingly."  Murray Energy Corp. v. McCarthy, 2016 WL 3390517, at *2 (N.D. W.Va. June 17, 2016).  There is a recognized reluctance to disqualify expert witnesses who "possess useful specialized knowledge."  Id.  Significantly, however, the considerations that govern expert witness disqualification are not the same as those governing attorney disqualification.  Expert witnesses and attorneys perform different functions: "Experts are not advocates in the litigation but sources of information and opinions."  Hewlett-Packard Co. v. EMC Corp., 330 F. Supp. 2d 1087, 1092 (N.D. Calif. 2004) (quoting English Feedlot, Inc. v. Norden Labs., Inc., 833 F. Supp. 1498, 1501 (D. Colo. 1993)).

When determining whether to disqualify an expert who first had contact with a party other than the proponent of his testimony, courts generally engage in the following inquiry:

> First, was it objectively reasonable for the first party who claims to have retained the consultant . . . to conclude that a confidential relationship existed? Second, was any confidential or privileged information disclosed by the first party to the consultant?

In re Orthopedic Bone Screw Prod. Liab. Litig., 1995 WL 925673, at *3 (E.D. Pa. May 5, 1995) (quoting Wang Laboratories, 762 F. Supp. at 1248 (internal citations omitted)). "Only if the answers to both questions are affirmative should the witness be disqualified." Larson, 284 F. Supp. 2d at 1156. If there were both a confidential relationship and a disclosure of confidential or privileged information, the expert should be disqualified. In re Orthopedic Bone Screw Prod. Liab. Litig.. 1995 WL 925673, at *3.  "If, however, the answer to one or both of the inquiries is negative, disqualification may not be warranted. Generally, disqualification 'should not occur where a confidential relationship existed but no privileged information was communicated, or, alternatively, where no confidential relationship existed but privileged information was nonetheless disclosed.'" Id. (quoting Mayer v. Dell, 139 F.R.D. 1, 3 (D.D.C. 1991)(internal citations omitted)).  "Thus, even if counsel reasonably assumed the existence of a confidential relationship, disqualification does not seem warranted where no privileged or confidential information passed." Murray Energy Corp., 2016 WL 3390517, at *2.  The party seeking disqualification bears the burden of showing the existence of confidentiality and its non-waiver.  English Feedlot, Inc, 833 F. Supp. at 1501–02 (internal citations omitted).

In addition to the confidentiality issues, some courts also weigh policy and fairness considerations.  More specifically, some courts "consider whether disqualification would be fair to the affected party and would promote the integrity of the legal process." Hewlett-Packard Co., 330 F. Supp. 2d at 1093.  In assessing fairness, courts may also consider

the availability of an alternative expert witness and, when the assessment is made at "late stages in the litigation," the potential disruption to the judicial proceedings. Id.

B.    FACTS AND ANALYSIS

Dr. Hollier had much more involvement in this case than the parties themselves realized; his points of contact with the case are presented herein in the order in which each was revealed.

- In June 2015, Plaintiff's initial disclosures listed four potential expert witnesses, including Dr. Hollier [DE 237].

- Defendants accused Plaintiff of contacting and disclosing well-known experts as a preemptive attempt to make them unavailable to Defendants [DE 237]. A hearing was held before Magistrate Judge Goodman on July 10, 2015 [DE 99].  Judge Goodman ordered [DE 100] the parties to file memoranda of law discussing whether Defendants should be precluded from contacting the proposed expert witnesses who had been listed by Plaintiff.

- On July 27, 2015, Plaintiff withdrew his ore tenus motion to prohibit Defendants from interviewing and retaining the expert witnesses who he had listed in his initial disclosures [DE 114].

- Thereafter, Defendants contacted Dr. Hollier for possible retention as an expert and learned that Dr.  Hollier had previously acted as a consultant to the United States in this action [DE 267, p. 119].

- In or around April 2016, the Assistant General Counsel for the Defendant University of Miami ("UM") contacted AUSA Monsour inquiring whether the Government had any objection to UM retaining Dr. Hollier as an expert in the case [DE 237-1]. Monsour would not specifically confirm whether the Government had in fact retained Dr. Hollier in the matter, but advised counsel that he would not object to UM's retaining Dr. Hollier [DE 237-1].   AUSA Monsour took the position that because the Government had declined to intervene in the case and Dr. Hollier's engagement had ended, the Government had no basis to object to Defendants retaining Dr. Hollier as an expert[12] [DE 267, p. 36-39].  AUSA Monsour also spoke to Dr. Hollier, telling

---

[12] AUSA Monsour testified that he advised both UM's general counsel and Dr. Hollier that a challenge to Dr. Hollier's retention by UM would likely follow [DE 267, pp. 29-30].

him that he could not prevent Dr. Hollier from working for Defendants, but reminding him to honor their confidentiality agreement.[13] [DE 267, p. 30].

• Defendants then retained Dr. Hollier as an expert witness. During Dr. Hollier's deposition, counsel for Plaintiff learned – for the first time – about the consulting work Dr. Hollier had performed for the Government [DE 262-1]. Dr. Hollier refused to answer questions about the scope of his work for the Government, stating that he had been advised by the Government that his work was confidential. [DE 264, p. 143].

• After Dr. Hollier's deposition, Plaintiff's attorney contacted AUSA Monsour to clarify that the Government had retained Dr. Hollier for work in this case  [DE 262-1]. Monsour provided a redacted copy of the Government's contract for services with Dr. Hollier [DE 222-3]. The Government had hired Dr. Hollier as a "Litigative Consultant" to review claims that Dr. Seth Thaller had intentionally performed unnecessary cleft lip and cleft palate surgeries in piecemeal fashion, where one surgery should have resolved the issue, in order to "increase the billing he and UM submitted to Medicaid, Medicare, and other federally funded healthcare programs" [DE 222-3, p. 7].   The agreement between the Government and Dr. Hollier contained a confidentiality provision that by its terms survived the termination of the agreement  [DE 222-3, pp. 10-11].

• At the hearing before Court, counsel for Plaintiff disclosed – for the first time --  that conversations between Plaintiff's counsel and Dr. Hollier had taken place before the suit was filed in 2012 [DE 264, p. 147].  Indeed, AUSA Monsour  did not learn about Hollier's pre-suit discussions with Plaintiff's counsel until the September  30, 2016, ex parte hearing [DE 267].

• To be clear, Dr. Hollier has, at various times since 2011, either spoken to or consulted with three of the four  entities that have an interest in this case: the Relator, the Government, and the Defendants.

---

[13] AUSA Monsour's concern with confidentiality was based primarily on the Government's interest in protecting from disclosure its process of investigation in qui tam proceedings:

> The approach we take in the sealed proceedings, the qui tam proceedings, is to seal the memoranda that we've submitted to the court that's talking about our investigation and what we've done, how we've done it, because we don't really like that to be in the public [DE 267, p. 43].

Monsour knew of no specific confidences that Dr. Hollier would be required to maintain [DE 267, p. 30].

Thus, the issues for consideration in this Motion to Disqualify are as follows: (1) Was there a confidential relationship between Dr. Hollier and the United States? (2) Was there confidential material exchanged between the United States and Dr. Hollier? (3) Is the United States the "real party in interest" in this case, such that Dr. Hollier cannot be permitted to "switch sides" and testify for Defendants, notwithstanding the Government's lack of objection? and (4) If disqualification is warranted, would it be fair to Defendants and promote the integrity of the legal process?

1.     Confidential relationship

There is no dispute that Dr. Hollier's relationship with the Government during its investigation of this matter was intended to be, and was in fact, confidential.  Dr. Hollier's agreement with the Government states, in part:

> Dr. Larry Hollier, M.D. Craniofacial Plastic Reconstructive Surgery recognizes that the USAO has and will have privileged law enforcement information, as well as non-privileged information obtained from federal agencies and employees, and other proprietary information (collectively "information") which are valuable, special and unique assets of the USAO. Dr. Larry Hollier, M.D. Craniofacial Plastic Reconstructive Surgery agrees that other than provided by law, [he] will at no time or under any circumstances, directly, or indirectly, divulge, disclose, or communicate such information to a third party, or use it for its [sic] own benefit without the prior written permission of the USAO. . . . [DE 222-3].

Indeed, AUSA Monsour testified at the ex parte hearing that all consultants retained by the Government are asked to sign a confidentiality agreement because of the investigative nature of qui tam actions.  At the time the Government retains a consulting expert in a qui tam action, the case is sealed,  the fact of its existence has not been made public, and the Government has yet to make a decision to intervene   [DE 267, p. 6].   Thus, the

33

Government is highly interested in maintaining the confidentiality of the consulting expert's work.   Furthermore,  the investigation in this case involved private citizens' confidential medical information and other confidential material.   Thus, the first prong of the analysis is met:   the Government and Dr. Hollier intended that  Dr. Hollier's work for the Government be confidential, at least during the time of the engagement.[14]

### 2.   Confidential information

Even where a formal contractual relationship exists, blanket disqualification of an expert witness may not be warranted.  <u>Hewlett Packard</u>, 330 F. Supp. 2d at 1094.   The court must also consider whether confidential information was shared between the litigant and the expert witness.  <u>See</u> <u>Wang Laboratories</u>, 762 F. Supp. at 1248. Confidential information is information that "can be readily identified as either attorney work product or within the scope of the attorney-client privilege." <u>Hewlett-Packard</u>, 330 F. Supp. 2d at 1094 (internal citations omitted). On this point, AUSA Monsour's ex parte testimony is clear: no confidential information was exchanged between the Government and Dr. Hollier [DE 267, pp. 27, 31-32]. Dr. Hollier reviewed ten patient files, which were the same patient files at issue in this litigation.  Dr. Hollier was asked to look at the patient files and

> opine on the propriety of the treatment that each patient
> received, and the billing that was submitted for each patient

---

[14] Dr. Hollier was retained by the Government in July 2014.  He finished his review by August 2014 and had no further conversation with AUSA Monsour after that time (aside from their subsequent telephone conversation in which AUSA Monsour reminded Dr. Hollier to honor their confidentiality agreement) [DE 267, pp. 8, 19-20]. The total contact between Dr. Hollier and AUSA Monsour consisted of a couple of emails and telephone conversations over the course of one month.   Dr. Hollier was engaged during the investigative phase of the Government's involvement [DE 267, p 38]. AUSA Monsour considered the engagement ended at the time the Government declined to intervene [DE 267, p. 20].

> and. . . . The procedures and the billing really. I wanted him
> to focus on both. And I directed his attention to the number of
> procedures performed on each patient. For example, the use
> of multiple procedures and whether or not the use of multiple
> procedures was justified and whether it was below the
> standard of care. I asked him to opine on the billing that was
> submitted for those procedures [DE 267, pp. 13-14].

AUSA Monsour did not disclose any of the Government's strategies, information about the

identity of the Relator, the complaint, or the allegations being made by the Relator,[15] nor

did he discuss the nature of the case, the reason for the investigation, or trial strategy. As

AUSA Monsour explained, "We did not discuss litigation strategy because at this point in

time, I wasn't intending or I had not determined that I was going to litigate the case" [DE

267, p. 15-16, 31].

"Unlike attorney-client communications, discussions between parties or counsel and

experts do not carry the presumption that confidential information was exchanged."

Hewlett-Packard, 330 F. Supp. 2d at 1094 (quoting Stencel v. Fairchild Corp., 174 F. Supp.

2d 1080, 1083 (C.D. Cal. 2001). In this instance, the evidence shows that confidential

information was not exchanged between the Government and Dr. Hollier. Although Dr.

Hollier's review of medical records did assist the Government in deciding not to intervene

in this litigation, the Government did not discuss the purpose for the review, or even the

fact of the litigation, with Dr. Hollier. As no confidential information was provided to Dr.

Hollier by the Government, there are no confidences that would be protected by

disqualification. See, e.g., Coates v. Duffer's Golf Center, Inc., 2007 WL 1289890 (D.

---

[15] AUSA Monsour stated that he did not have anything in particular in mind when he reminded Dr. Hollier about the confidentiality agreement, but raised the issue "in an abundance of caution" [DE 267, pp 30-31].

Mass. May 2, 2007)(consulting expert who had received non-confidential case information – discovery, photographs, etc. -- from Plaintiff's counsel not disqualified from serving as expert for defense).  Accordingly, the Court concludes that disqualification of Dr. Hollier is not warranted on the basis that he obtained confidential information.

      3.    The Government as Real Party in Interest

The parties dispute whether Plaintiff has standing to raise the issue of disqualification of Dr. Hollier.  Plaintiff never retained Dr. Hollier as an expert, and has not proffered any confidential information that was shared with Dr. Hollier.  As a result, Defendants argue that no confidential relationship existed between Hollier and Plaintiff that would give Plaintiff standing to seek Dr. Hollier's disqualification. Plaintiff counters that the Government is the real party in interest in this qui tam action and, therefore, Dr. Hollier can not be permitted to simply "switch sides" and testify for Defendants. However, the issue on proposed disqualification of an expert is not the "side" with which the expert originally consulted, but whether the relationship was reasonably considered to be confidential and whether there was an exchange of confidential information.  There having been no disclosure of confidential information by the Government to Dr. Hollier, the Government's status as a "real party in interest" in this qui tam action does not affect the disqualification analysis.

      4.    Fundamental Fairness and Integrity of the Legal Process

The parties strenuously argue the policy considerations implicated by the requested disqualification of Dr. Hollier.  Defendants argue that their case would be severely damaged if their expert witness were disqualified at this late date before trial.  Defendants also argue that Plaintiff (and the Government) waived any objections to Dr. Hollier's

36

testimony by having previously consented, or not objected, to his hiring by Defendants. For his part, Plaintiff argues that there is a substantial likelihood of prejudice if the jury were to learn that Dr. Hollier previously consulted for the Government and that a limiting instruction would serve little to no purpose in light of the potential harm.   Plaintiff also argues that Defendants have retained another medical expert, Dr. Staffenberg, and therefore disqualification of Dr. Hollier is not likely to damage Defendants' case.

In light of the Court's conclusion that disqualification of Dr. Hollier is not warranted, Defendants' arguments regarding waiver and prejudice need not be addressed.  However, the Court notes that Defendants had acknowledged to AUSA Monsour that they were aware of a potential challenge to Dr. Hollier's testimony even before they retained him, yet they were confident that they would prevail on such a challenge [DE 267].  The Court concludes, therefore, that Defendants cannot persuasively claim prejudice after entering into a relationship with Dr. Hollier with full knowledge of the risks.

As for Plaintiff's argument that he would be severely prejudiced if the jury were to learn that Dr. Hollier previously consulted for the Government in this case, the undersigned submits that a motion in limine to exclude any reference to Dr. Hollier's consulting for the Government would be the appropriate vehicle through which to resolve that issue.  Finally, as mentioned earlier, the cumulative nature of testimony from Dr. Hollier and Dr. Staffenberg is an evidentiary matter for the trial court.

The Court acknowledges a certain level of discomfort with the fact that Dr. Hollier has, at various times, spoken to or consulted with Plaintiff, the Government, and

Defendants.  His having done so raises concerns that could justify disqualification.[16] However, the Court is convinced that Dr. Hollier did not receive confidential information from either Plaintiff or the Government.  This evidence allays the concerns that might otherwise support disqualification.  In sum, given that the information provided to Dr. Hollier by the Government was neither confidential nor privileged, the Court concludes that Dr. Hollier should not be disqualified, and accordingly, Relator's Motion will be denied..

IV.   CONCLUSION

In light of the foregoing discussion on the matters referred, it is hereby **ORDERED AND ADJUDGED** as follows:

1.   Defendants' Motion to Strike Dr. James Flores as an Expert Witness and to Strike His Expert Report [DE 200] is **GRANTED.**

2.   Defendants' Motion to Strike Jean Acevedo as an Expert Witness and to Strike Her Expert Report [DE 201] is **DENIED.**

3.   Relator's Corrected Motion to Disqualify Larry H. Hollier, Jr., M.D. from Testifying at Trial on Behalf of Defendants, Seth R. Thaller, M.D. and/or University of Miami [DE 222] is  **DENIED.**

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 1st day of November, 2016.

Copies furnished counsel and
The Honorable Joan Lenard
via CM/ECF

BARRY S. SELTZER
United States Magistrate Judge

---

[16] The Court does not imply any wrongdoing or actual impropriety by Dr. Hollier.